1  KATHLEEN J. ENGLAND, Nevada Bar No. 206
2  **GILBERT & ENGLAND LAW FIRM**
   610 South Ninth Street
   Las Vegas, Nevada 89101
3  Telephone:   702.529.2311
   E-mail:        kengland@gilbertenglandlaw.com
4
5  JASON R. MAIER, Nevada Bar No. 8557
   DANIELLE J. BARRAZA, Nevada Bar No. 13822
6  **MAIER GUTIERREZ & ASSOCIATES**
   8816 Spanish Ridge Avenue
7  Las Vegas, Nevada 89148
   Telephone:  702.629.7900
   Facsimile:  702.629.7925
8  E-mail:        jrm@mgalaw.com
                  djb@mgalaw.com
9
10 *Attorneys for Plaintiffs William J. Berry, Jr.,*
   *Cynthia Falls and Shane Kaufmann*
11
12
13                 **UNITED STATES DISTRICT COURT**
14                      **DISTRICT OF NEVADA**
15  WILLIAM J. BERRY, JR.; CYNTHIA          Case No.: 2:17-cv-00019-GMN-PAL
    FALLS; SHANE KAUFMANN,
16                                          **PLAINTIFFS' OPPOSITION TO**
                      Plaintiffs,           **DEFENDANT'S MOTION FOR**
17                                          **SUMMARY JUDGMENT**
    vs.
18                                          ORAL ARGUMENT REQUESTED
    DESERT PALACE, INC. d/b/a CAESARS
19  PALACE; et al.,
20                    Defendants.
21

22        Plaintiffs William J. Berry, Jr., Cynthia Falls, and Shane Kaufmann, by and

23  through their undersigned counsel, hereby file this opposition to Defendant Caesars

24  Palace's motion summary judgment [ECF No. 99] filed on January 9, 2019.

25        This opposition is made pursuant to Fed. R. Civ. Pro. 56 and based on the

26  following memorandum of points and authorities, the papers and pleadings on file herein,

27  the affidavits and additional exhibits attached hereto, and any oral argument of counsel to

28  be permitted at the time of the hearing.

                                    1

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION**

This discrimination and retaliation case stems from Defendant Caesars Palace's long-standing, lucrative practice of catering to its wealthy customers by accommodating preferences and objections to dealers of a  with illegal demands for table games dealers of a certain gender, color, ethnic background, or national origin.  Specifically, Caesars has allowed its high-end Palace Court customers to dictate whether they want to be dealt to by, or even in the same room as, Caesars employees of certain protected characteristics. The preferences vary, but many high-limit customers demand young, Asian, female dealers, which Caesars readily accommodates.  Caesars has been accommodating these requests by either not scheduling certain employees in Palace Court and its private salons, or by forcing its employees to endure the humiliation of being *removed* from these prestigious areas during their shifts and relegated elsewhere, such as the main area of Palace Court or the main casino.  On four separate occasions, administrative agencies have ruled in favor of these Plaintiffs and determined this Caesars practice to be illegal discrimination.  The NERC ruled in Mr. Berry's favor in 2008; the EEOC ruled in favor of all three Plaintiffs in 2015.

Caesars attempts to justify its illegal activity with two main pretextual arguments: 1) that there is no discrimination because Caesars only accommodates customer requests for gaming personnel based on customers wanting "dealers with Chinese language fluency to facilitate interaction with non-English fluent clientele," and 2) it does not matter that Caesars segregates its employees based on their protected statuses – because there is allegedly no material effect on the terms and conditions of job opportunities, as dealers who work in the Palace Court are paid "exactly the same as dealers who work elsewhere," and all dealer tips are pooled.  Both of these points are not only misguided but faulty, as proven by the evidence obtained in discovery.

Caesars' own documents have memorialized numerous instances of the casino complying with customer requests for dealers of or not of a particular race, gender, or

ethnicity.  Further, Caesars' own Vice President of Far East Marketing, Maggie Gong, testified that while Caesars has long had a standard policy on paper against discrimination, "it was not enforced and trained [to Caesars staff]" until approximately August of 2018 – long after the first Plaintiff Mr. Berry started complaining and after the 3 plaintiffs filed this lawsuit.  Additionally, the excuse of language skills as a justification for the illegal assignments is nonsensical, as it is not necessary for a dealer to speak the customer's language, and other personnel are always on-hand to deal with any translation issues.  As for the claim that changing job assignments in no way materially effects the terms and conditions of the Plaintiffs' jobs, this is a gross misstatement.  Caesars' continued catering to its high-value customers' discriminatory requests has led to the Plaintiffs suffering material effects, including financially, as it is well-established that employees working inside Palace Court and its private salons are afforded more overtime opportunities than those who are not.

As shown below, Caesars' motion for summary judgment fails because there are material issues of fact as to whether Caesars discriminated against Plaintiffs based on their race, gender, and ethnic and nationality backgrounds, and then retaliated against Plaintiffs after each of them complained internally to the company, and then to NERC and the EEOC.

## II.      STATEMENT OF UNDISPUTED FACTS

Plaintiff William Berry

Plaintiff William Berry is a black, African-American male who was hired as a table games dealer by Caesars in 1992 and promoted to a floor supervisor in May 1995. **Ex. 1**, Berry Dep. at 34:10-15; 73:13-74:12; 77:16-78:1.  As a floor supervisor, Mr. Berry worked swing shift at Caesars, which ranged anywhere from starting work from 6:00 to 10:00 p.m., and ending work from 2:00 a.m. to 6:00 a.m., depending on the business of the casino.  *Id.* at 79:11-80:7.  Around 2001 or 2002, after significant in-house training and observation of baccarat, Mr. Berry transitioned to Palace Court ("PC").  *Id.* at 87:11-88:5; 88:20-21.  PC is the high-limit gaming area inside Caesars, which is separate from

the main gaming areas.  *Id.* at 105:12-14.  There are also private salons within the PC, which are considered "ultra high limit rooms that are reserved for specific clientele."  *Id.* at 105:14-16.  Mr. Berry testified that he was assigned[1] as a floor supervisor inside PC for about 90-95% of the time (specifically at the baccarat tables) for about four to five years near the end of his employment at Caesars (which ended in September 2008), however things changed once complained about filed a discrimination in 2006.  *Id.* at 87:17-22.

On numerous occasions during his employment at Caesars, Mr. Berry personally observed certain PC salons being rearranged according to customer preferences (such as for young female dealers).  *Id.* at 151:14-152:17.  One particularly egregious incident occurred on 2/15/2006, when Mr. Berry was scheduled to go to PC private salon "Room B" to send the floor supervisor on break, act as the relief floor supervisor until the assigned supervisor returned. *Id.* at 154:13-155:11.  *See also*, **Ex. 2**, EEOC (B) 352 (NERC Charge of Discrimination).[2]

When Mr. Berry relieved the floor supervisor in Room B for his break, Mr. Berry noticed the customers in the room looking "irritated and/or afraid or bothered by my presence being in the room."  Ex. 1. at 155:2-7.  After Mr. Duke returned and Mr. Berry left the room to go to the podium to see who was next on the list to be relieved, he was stopped by Alma French (temporary pit supervisor), who told him not to go back in Room B.  Id. at 155:8-11.  Mr. Berry asked why not, and she refused to answer the question and reiterated "Just don't go back in the room."  Id. at 155:12-18.  Another floor supervisor

---

[1] Caesars employs "pencils," who fill out boxes on a "road map" document signifying exactly where each dealer and supervisor is assigned, but those pencils "get their directive from management."  *Id.* at 109:2-8.  *See also* Ex. 17 at 422:7-424:5 (indicating that pencils get their directives from management and hosts and create the roadmap shortly before dealers arrive for their shifts; the roadmap also gets changed *during* shifts).

[2] Just two days earlier, Mr. Berry had noticed two black employees (Cindy Smith and Anthony Schocuir) being relocated out of Room B shortly after they had entered the room and then being replaced by Caucasian employees, so Mr. Berry was aware that the Room B customers may have been making illegal requests based on race that Caesars was accommodating. Ex. 1 at 154:19-21; 166:9-167:7; 174:2-4; 177:18-21.

(Antone Rodrigues) then approached Mr. Berry and told him that he was told by Alma French that there is to be "no blacks in the room whatsoever."  Id. at 155:19-21.

Mr. Berry took the written podium notes from that night which evidenced illegal customer preferences being honored for Room B's high-end customers.  *See* **Ex. 3** EEOC (B) 068 (Podium Notes).  These podium notes[3] specifically say "female DLRS" and "No --- " (without the sentence completed).  *Id.*  Mr. Berry testified that "No --- " was "understood in the pit to be no blacks." Ex. 1 at p. 156:7-11.  The podium notes stem from customer requests relayed through casino hosts, to casino management. Id. at 159:21-160:10.

To ensure that surveillance tapes showing African-Americans being absent from Room B were preserved, Mr. Berry initially complained to the Nevada Gaming Control Board ("GCB") on or around February 16, 2006.  Id. at 268:12-275:8.  Mr. Berry was later informed that his claims could not be substantiated, and Mr. Berry was never allowed to review any of the surveillance footage to aid in explaining the situation to GCB.  Id. at 275:6-8.

Mr. Berry complained to Caesars internally on 2/28/2006 and then cooperated with the internal Caesars HR investigation in March 2006, which largely corroborated and confirmed his suspicions that black employees were being deliberately kept out of the room. **Ex. 5** (WJB 047-050, Faxed HR Complaint); **Ex. 6** (Caesars-Berry 0000956, typed WB statement).  The results of the investigation were delivered to Mr. Berry on March 31, 2006, with Dean Allen (the Vice President) denying discrimination, while at the same

---

[3]  It is important to note that Page 1 of this document (ostensibly from a Caesars Host) was never produced, and Plaintiffs reasonably believe Page 1 implicates Caesars' management and proves that the decision to honor illegal race-based customer preferences was made by and came directly from management. *Id.*  Mr. Berry requested Page 1, but Caesars failed to provide it, claiming that it "conducted a reasonable search proportional to the needs of the case," which yielded "no responsive documents."  **Ex. 4** Caesars' Responses to First Set of Requests for Production of Documents.

time admitting that the exclusion of African American employees occurred (but was allegedly an assumption made by a fellow supervisor):

> On 3/31/2006, Dean Allen and I met with William Berry and informed him that the investigation has been concluded.  Dean informed him that the directive did not come from management, rather it was an assumption made by one of his fellow supervisors.  After the meeting, William faxed a request that Human Resources keep copies of the videos in Palace Court, Room B from the dates in question.  Because his initial statement was not received in a timely manner, video was no longer able to be copied.

**Ex. 7** (EEOC B 155-156). Corroborating witness and co-worker Maureen DesChamps was never interviewed.  She later gave a strong corroborating statement to the NERC. **Ex. 8**, (EEOC B 342); **Ex. 9**, Affidavit of Maureen DesChamps.  No action was taken by Caesars as result of this internal investigation.  So then, in 2006, Mr. Berry filed with the NERC to seek a remedy for what Caesars casino employees understood was illegal. Ex. 2.

Predictably, after Mr. Berry made his discrimination complaint in 2006, Caesars started assigning him outside of PC, and stopped extending him basic privileges he and other floor supervisors normally enjoyed, such as leaving work early on non-busy days, and not getting automatically dinged with disciplinary attendance points for being a few minutes late from breaks.  Ex. 1 at 394:19-395:8; 397:2-399:20; 451:21-454:12; 456:2-457:15; 458:13-21; 800:18-22.  Mr. Berry also rarely served as a relief supervisor after he complained, which adversely affected him, as relief supervisors usually get to leave earlier than other supervisors.  Id. at 454-456; 800:9-17.

On April 30, 2008, the NERC found probable cause that Caesars committed illegal discrimination against Mr. Berry. **Ex. 10**, 4/30/2008 NERC Determination. Shortly thereafter, the EEOC asserted jurisdiction over this matter and notified all.  In September 2008 (just five months after NERC issued its Determination of Discrimination), Caesars suspended Mr. Berry. **Ex. 11**, EEOC (B) 645.  Caesars waited until Mr. Berry was an hour or two into his shift on September 15, 2008, then summoned him to a meeting and claimed he was a no-call no-show, handed him a document that provided zero detail as to the alleged attendance infraction, offered Mr. Berry no further verbal explanation of the alleged

infraction, and offered him no chance to provide an explanation.  Ex. 1 at 889:16-892:6.

Mr. Berry was then forced to immediately vacate the building as if he were a criminal,

which was humiliating. Id. at 891:9-893:16.   This also prevented Mr. Berry from

conducting his own investigation to find out what he was being accused of and why.  Id. at

906:4-908:14.

The following day, on September 16, 2008, Mr. Berry had a meeting with Caesars

HR, where he was forced to sign termination paperwork that he was not provided a copy

of, was once again provided no documents showing how he allegedly had accumulated the

12 attendance points justifying his termination, and was then forced to immediately leave

the property.  *Id.* at 911:12-917:15.  This is how Caesars terminated a 16-year employee.

In May 2009, the EEOC allowed Mr. Berry to file an Amended Charge to include

his termination. **Ex. 12**, EEOC B 358-359. The EEOC's investigation resulted in

confirmation from Antone Rodrigues in the form of an affidavit and an investigative

interview that there were in fact no blacks allowed in Room B on the night at issue. **Ex. 13**,

EEOC B 314-316; 332-333.

The EEOC conducted an interview with Caesars VP of Labor Dean Allen—who

admitted gender specific dealer requests were granted and carried out in the casino for high-

end customers.  **Ex. 14** (EEOC B 301-304).  The EEOC issued its Determination on May

22, 2015, which found that "there is reasonable cause to believe that [Mr. Berry] and other

similarly situated individuals were discriminated against and subjected to a hostile work

environment due to their race, sex, and national origin, non-Chinese."  Ex. **15**, EEOC B

009-010.  The EEOC did not make any finding regarding the retaliatory discharge.  *Id.*

Thereafter, Mr. Berry received his Notice of Suit Rights (dated September 29,

2016), and proceeded to file suit after securing permission to lift the stay in Caesars

Bankruptcy proceedings to do so.  **Ex. 16**, Notice of Suit Rights (EEOC B 002).

<u>Plaintiff Cynthia Falls</u>

Plaintiff Cynthia Falls is a 65 year-old Caucasian woman who has been employed

at Caesars as a table games dealer since November 14, 1979.  **Ex. 17**, Dep. of Falls at

31:11-12.  As a result of Caesars' insistence on accommodating illegal customer requests, Ms. Falls has been discriminated against, at various times throughout her employment at Caesars, based on her race, sex, nationality, and age.  Id. at 69:10-15.  As a result of the ongoing discrimination that Ms. Falls and other dealers were being subjected to, the Transport Workers Union of America, Local 721 (which represents Caesars dealers) sent correspondence to Caesars President Gary Selesner dated January 25, 2010, complaining of the discrimination taking place regarding Caesars management obliging illegal customer requests.  **Ex. 18**, EEOC F 63; Ex. 17 at 156:2-158:25.  Caesars VP Dean Allen responded to the letter, stating that Caesars would only look into claims not previously "presented."  **Ex. 19**, EEOC F 064.

After Caesars failed to address the issue (and instead retaliated against Ms. Falls by moving her out of PC, where she had been consistently dealing for years[4]), Ms. Falls filed a Charge of Discrimination with the EEOC on 10/26/2010. **Ex. 20**, EEOC F 116-117.  Ex. 17 at 70:2-17; 71:3-19.  This Charge outlined other instances in which Ms. Falls was not allowed to deal to certain customers due to requests for certain dealers based on national background and gender, and described the retaliation that took place after the union letter was issued.  Ex. 19.  Ms. Falls documented some of the discriminatory conduct that she observed in 2010, which she authenticated during her deposition.  **Ex. 21**, EEOC F 070-72; Ex. 17 at 76:11-77:5.  In 2012, another humiliating incident occurred where Cynthia Tobias, a black female dealer, was removed in public from a (PC extended pit) game when the customer requested a white dealer.  **Ex. 4** (EEOC K068-69).

During her deposition, Ms. Falls detailed numerous instances of Caesars permitting customers to dictate which dealers they want based upon discriminatory

---

[4]  It is humiliating for PC dealers to be moved out to the main floor, and Caesars management knows this. PC dealers wear tuxedos to work, whereas dealers in the main area where plain Caesars' shirts, and it is degrading to removed from PC and forced to deal in the main area while in a tuxedo. Ex. 1 at 1020:5-1021:3. The overtime opportunities are also different for those in PC, as PC dealers sometimes work for days and days on end. Ex. 29 at 98:2-19.

preferences.  Ex. 17 at 79:13-111:21; 114:22-120:20. Many of these incidents directly impacted Ms. Falls, such as the time she witnessed a customer tell a supervisor in perfect English that only "Chinese dealers" would be acceptable (which resulted in Ms. Falls being removed from that room and replaced with a Chinese dealer). Id. at 375:5-378:23. *See also*, 378:24-382:14 for additional incidents where Ms. Falls heard the preference being espoused by the customer or a member of management.  Ms. Falls also testified to the accuracy of the details she submitted in her EEOC intake questionnaire, which included one particularly degrading incident in which Caesars management (Sammy Ortiz, Assistant Casino Manager) told her to remove her bow tie to accommodate a customer who only wanted female dealers.  Ex. 17 at 304:17-306:24; 330:15-337:26.

Moreover, Ms. Falls authenticated during her deposition and explained the numerous handwritten notes evidencing discriminatory practices she observed. **Ex. 22**, CCF425; 464; 470; 473; 474; 511; 513; 514; 515; 518; 521; Ex. 17 at 271:1-272:3.  *See also*, **Ex. 23**, (2011-2012 notes) CCF 045-56, 59-61, 68-72, 74-77, 90, 95, 98-104, 106, 120, 123-125, 134-136, 138-146, 150-157; Ex. 17 at 389:11-390:23.  *See* **Ex. 24**, (2014 notes) 171-183; 392:11-17.  See Ex. 24, (2015 notes) CCF 393-400; Ex. 17 at 393:2-394:2.

Ms. Falls was not the only one noticing Caesars' rampant discrimination. In November, 2013, over <u>fifty</u> Caesars dealers submitted corroborative statements to the EEOC that they had witnessed dealing assignments or removals based on race or gender. **Ex. 25** (EEOC K188-245).  Ms. Falls testified to the distinction between customers asking for a specific dealer because they have a rapport with that dealer, and customers objecting to dealers by race, sex, nationality, age, or gender and demanding to be dealt only by dealers of certain protected status(es), and explained that it is the latter conduct which is the subject of this lawsuit. Ex. 17 at 368:19-370:21.  Yet again in July, 2014, 47 gaming employees signed a petition to Caesars HR protesting the favoritism and preferences being accorded to young, Asian-looking, female dealers. **Ex. 26** (SBK 220-225).

Thereafter, on 7/23/2014, Ms. Falls filed her Second Charge with the EEOC, which detailed the retaliation she suffered since filing her First Charge, including being punished for complaining that only the Asian Table Game Dealers were promoted in the high limit area over the non-Asian employees. **Ex. 27** (EEOC F 265). *See also*, Ex. 17 at 166:7-168:11.  Ms. Falls was disciplined for complaining and speaks volumes, as the write-up admits that she complained of discrimination, and then says that Ms. Falls must "refrain from speaking negative about the Company to other employees," without any promise to actually look into the legitimacy of Ms. Falls' claims or investigate whether there is racial discrimination occurring, specifically with respect to Asian-looking female dealers being favored over others. **Ex. 28**, EEOC F 167.  This is the very definition of retaliation, i.e. conduct which would discourage workers from reporting discrimination.

In a letter dated May 22, 2015, the EEOC issued its Determination, finding that once again, Caesars preferential, segregating practice of dealer assignment was discriminatorily illegal.  **Ex. 29**, 5/22/15 EEOC Determination for Falls.  As a result of Caesars' ongoing discrimination, Ms. Falls has endured emotional distress, including increased stress levels to the point "where I didn't want to go to work at all," anxiety, headaches, and difficulty sleeping.  Ex. 17 at 452:22-459:16.

Plaintiff Shane Kaufmann

Plaintiff Shane Kaufmann is a 62 year-old African-American male, who has worked at Caesars since being hired in 1992 as a table games dealer.  **Ex. 30**, Kaufmann Dep. at 27:15-28:14.  On 2/24/2010, Mr. Kaufmann submitted a statement to the EEOC, detailing illegal discrimination based on color or gender.  **Ex. 31**, EEOC B 288-290.  Mr. Kaufmann sent a follow-up letter to the EEOC a few days later on 2/28/2010.  **Ex. 32**, EEOC K 043; Ex. 30 at 179:17-180:23.  Mr. Kaufmann, who is also a member of the TWU union, was also involved in sending the 1/25/2010 union letter to Caesars President Gary Selesner, which put him on notice of the ongoing discrimination based on customer preferences.  Ex. 18.

Like Ms. Falls, Mr. Kaufmann filed a Charge of Discrimination after Caesars failed to fix its discriminatory practices. **Ex. 33**, EEOC K 118. Mr. Kaufmann testified to being shunned from certain tables based on his gender and race. Ex. 30 at 109:8-23; 118:2-24; 398:11-18. Mr. Kaufmann also kept notes from 2010 and 2014 detailing specific instances that he felt constituted discrimination – including against him personally.[5]

On January 7, 2014, Mr. Kaufmann filed his Second Charge of Discrimination with the EEOC, which detailed the retaliation he had been suffering since filing his initial Charge in October 2018, including being removed from Palace Court in June 2013 and being asked to deal games he had no experience in dealing. **Ex. 35** SBK 240; Ex. 30 at 152:17-153:11. Mr. Kaufmann testified to the devastating effects being moved from PC to the main floor has on table dealers, as most of the overtime is available to those who deal in PC. Ex. 30 at 98; 134; 150.

In 2012-2014, Mr. Kaufmann frequently complained to Caesars management and urged management to go back and see what happened to Mr. Berry in 2006 and 2008 – to no avail. **Ex. 36** SBK 218, 217, 229. The EEOC issued its Determination on 5/22/15, finding that Mr. Kaufmann and other similarly situated individuals were "discriminated against and subjected to a hostile work environment due to their race, sex, and national origin, non-Chinese." **Ex. 37**, EEOC K 141-142.

And still the illegal assignments and exclusions continue (to the present) although they are more subtle and less overt, and easier to disguise because Caesars has strategically hired its way out of its problem by making the full-time casino workforce predominantly female and of Asian ethnicity. **Ex. 38**, EEOC F 174, EEOC K 155. Kimball Williams, Caesars scheduling coordinator, testified that the majority of dealers that Caesars promoted from part-time to full time positions were of Asian nationality. **Ex. 39**, Williams Dep. at 264:14-271:10.

---

[5] **Ex. 34**, SBK 252-284; SBK 002-15; 27; 29; See also, Ex. 30 at 193:14-194:16; 501:3-19; 503:6-506:7; 507:22-518:18; 526:9-536:24; 537:20-539:18; 548:22-552:22.

<u>Undisputed Evidence Exposing Caesars' Discriminatory Conduct</u>

Caesars' own document productions preclude it from claiming that all of its customers who prefer certain dealers are doing so only because of language barrier issues. Numerous Caesars documents show casino management preparing to grant customer requests for certain dealers, such as "Asian dealers" "preferred females" with absolutely <u>no details</u> to what language these Asian dealers should speak (as if everyone from Asia speaks the same language). *See* **Ex. 40**, CB 0023263; 0023295; 0023308; 0023309; 0023251; 0023317; 0023261; 0023280; 0023169; 23170; 23332-33; 23221; 23223-24; 23237; 23312 .  One internal management email references a need for "European female dealers," (which really means White female dealers, as there is no standard "European" language). Id. at 0023280.  The private salons paperwork that is compiled for each salon has numerous race and gender-based remarks for the customers, including "Need Female Chinese Dealers."  Eg Caesars Berry ("CB") 0023170; 23312.  There is also a 2014 email from an Assistant Casino Manager regarding "Far East Guests," which states that a certain customer "may request non-Asian speaking dealers, depends on his luck." CB 0023332-33.  Another 2014 management email states "Caucasian Females to start. No Chinese Dealers if at all possible."  CB 0023221.  There is also a 2014 email from Dan Burdalski which simply tells the Assistant Casino Manager to remove the references to race and gender preferences from the email memo – but offers <u>no guidance</u> as to whether that preference should actually be accommodated or not. CB 0023223.

In June/July of 2014, Caesars conducted an internal investigation into the discrimination complaints, which <u>completely substantiated</u> the allegations that Chinese dealers, typically female, were being heavily rotated into PC rooms as a result of customer requests, and that this was done on a continuing basis at Far East Marking VP Maggie Gong's direction. **Ex. 41**, Janiga Docs (CB 023377; 0023392; 0023363; 0023373; 23374; 023375.  This report was similar to the 2006 internal investigation, which confirmed that rooms were staffed "to use Asian female dealers or any female dealers if scheduling permitted." **Ex. 42**, CB0002152, 0002153.

Even after this internal report was released, Caesars continued complying with illegal customer preferences for years – as evidenced by its own management-level emails. **Ex. 43**, CB 0023096; 0023273; 0023274; 0023298; 0023299; 0023300; 0023301; CB0023097; 0023098-99; CB0023293; 0023281; CB0025207; 0023307.  Caesars knows exactly how to coordinate a legitimate language request, and it is not by saying "Asian dealers," but it is by documenting the actual language that is being requested in the notes for that specific high-value customer.  CB 0023097-99 (still improperly accommodating a request for a "female" dealer, but indicating exactly what language the customer needs).

Indeed, Maggie Gong, VP of Far East Marketing, even testified that while Caesars may have had a written policy prohibiting discrimination based on race or gender, she "do[esn't] remember if" she knew about it or if it was enforced, and that it was "not enforced [or] trained" on until recently, and that it "could be true" that she accommodated certain customers who only wanted to be dealt to by female dealers.  **Ex. 44**, Maggie Gong Dep. at 135:3-137:1.

## III.      OVERVIEW OF DISPUTED FACTS

Defendant's motion references numerous "undisputed facts" which are actually either disputed facts or completely disproven by discovery and testimony in the record.

Whether Caesars "assigns dealers to the PC based on their technical skills . . . ability to provide a high level of customer service, ability to handle the pressures of high limit gaming, and often, dealers with Chinese language fluency to facilitate interaction with non-English fluent PC clientele," [ECF No. 99 at p. 4] is a disputed fact, and is contradicted by Caesars' own documents.  *See* Ex. 40-43.  Caesars cites to the declaration of Roland Saenz in support of this disputed fact, yet his statements in no way account for Caesars' practice of excluding more skilled and experienced dealers (such as Mr. Kaufmann) completely from PC.  *See* **Ex. 45**, Falls Afft. at ¶¶ 11-13; **Ex. 46**, Kaufmann Afft. at ¶¶ 8-13. That Caesars is even trying to frame Mr. Saenz's company-serving statements as "undisputed facts" is absurd, as non-party witnesses have corroborated that Caesars does in fact cater to illegal customer requests, not based on any kind of language

13

issue or ability to handle the pressures of high limit gaming. *See* Ex. **47**, Christopher Palmer Afft. at 8, 9, 10, 12-14, 18. *See* **Ex. 48**, Stephanie Rose Afft. at ¶¶ 7-10; 14. **Ex. 49**, Kellie Sesto Afft. at ¶¶ 8-18; **Ex. 50**, Pamela Duefrene Afft. at ¶¶ 7-9; 11-13; 15-18.

Whether dealers who work in the PC "receive no monetary benefit over those who work in the main casino" [ECF No. 99 at p. 4] is a disputed fact. Ex. 30 at 98; 134; 150. Additionally, while it is unclear whether Caesars is "required" to give overtime to those who sign up for overtime before providing it to others [ECF No. 99 at p. 5], whether Caesars actually *practices* any such requirement is a disputed fact. Ex. 49 at ¶ 21; Ex. 47 at ¶ 22. This is also missing the point that aside from monetary benefits, Caesars has made it clear that its employees should strive to be PC dealers, and it is embarrassing and degrading to have to transfer from PC to the main floor – Caesars knows its employees consider such a transfer to be a punishment, and they act accordingly. Ex. 45 at ¶¶ 16-18; Ex. 47 at ¶ 21.

Whether a dealer's assignment changes between shifts and within the same shift "depending on the needs of the business" is a disputed fact. ECF No. 99 at p. 4. Caesars cites to Dan Burdalski's declaration in support of this sweeping generalization that really does not say anything. Numerous witnesses have disputed this and said it can be done for improper purposes. *See* Ex. 45-50.

Whether Mr. Berry was excluded from a PC private salon because of his race is an issue of fact, and Caesars' motion actually contradicts the evidence in the record as to why Mr. Berry was excluded. The NV Gaming Control Board's investigation indicates that Caesars VP of Table Games Jimmy Wike conceded that the group of customers in that private salon did in fact request "no African Americans and no white males" (supposedly because they wanted personnel that spoke their language). **Ex. 51**, CB 0002155-156. That investigative report makes no mention of Mr. Berry allegedly being a poor baccarat supervisor. But now, over a decade later in his declaration, Mr. Saenz states for the first time that had Mr. Berry asked why he had been assigned out of the PC private salon, he would have been told that it "had nothing to do with race," but rather, "the customers in

1   Salon B were extremely skilled baccarat players and Berry was not highly skilled at

2   baccarat." ECF No. 99 at p. 6 fn. 5. This makes no sense and is completely disputed. **Ex.**

3   **52**, William Berry Decl. at ¶¶ 6-7; Ex. 46 at ¶¶ 14-15; Ex. 45 at ¶ 14.

4        Whether Mr. Berry was terminated because he "exceeded allowable attendance

5   points under Caesars policy" is an issue of fact. ECF No. 99 at pp. 5; 7. Under Caesars'

6   attendance policy, an accumulation of 12 attendance points in any rolling 12 month period

7   resulted in grounds for termination. *Id.* at p. 8. Caesars has conceded that accumulating

8   12 points is merely a "terminable" offense, and has refused to admit or deny whether every

9   single employee who accumulates 12 attendance points is automatically terminated. **Ex.**

10  **53**, Rule 30(b)(6) Dep. at 268:2-269:4.

11       The highly unusual manner in which Mr. Berry was (not) put on notice of his

12  attendance points leading up to his termination speaks volumes as to Caesars' rush to

13  terminate Mr. Berry, regardless of whether he had actually accumulated the mandatory

14  number of points. Caesars has produced a document dated 8/18/08 indicating that Mr.

15  Berry received a half point for an "early out" attendance violation occurring on 8/14/18,

16  and that as of 8/18/2008, Mr. Berry had accumulated 5.5 total points. **Ex. 54**, CB 000004-

17  5. On 8/20/18, Mr. Berry signed off on receiving notice of this violation – meaning it was

18  already prepared two days prior to his receiving it. *Id.* Notably, on the August 2008

19  "document coaching" write-up, Caesars actually attached the "list of violations," so as to

20  put Mr. Berry on notice of exactly how he had accumulated 5.5 points. Id.

21       For some reason, Caesars lumped all of Mr. Berry's approved FMLA-leave in with

22  its "violations" list, which serves no purpose other than to make Mr. Berry look bad for

23  taking his legal FMLA leave. *Id.* Kimball Williams, who has been a Caesars employee

24  since 1976, testified that she has never heard of a situation where somebody was given a

25  suspension pending investigation without the list of violations attached to it, and that it is

26  standard procedure to always attach the list of violations to any kind of written warning,

27  document coaching, or suspension pending investigation. Ex. 39 at 301:23-302:24.

28       Yet in this case, Caesars suspiciously failed to attach a list of violations to the

1    Suspension Pending Investigation document that Mr. Berry received on 9/15/08.  Ex. 11.

2    It was not until 2009 when Caesars produced to the EEOC a "Discipline History Fact

3    Sheet" which purportedly evidenced how Mr. Berry accumulated 12 attendance points.

4    **Ex. 55**, EEOC B 467.  That document indicates that <u>as of August 20, 2018</u>, Mr. Berry was

5    only at 5.5 total attendance points.  Per Caesars' motion, a 6 point assessment was reserved

6    for "no call/no show" infractions.  ECF No. 99 at p. 8.  Thus, it is an issue of fact as to

7    where the extra half a point came from to put Mr. Berry at 12 points following the alleged

8    no call/no show that occurred on September 13, 2008 – and when Caesars memorialized

9    that extra half point.

10          In March 2018, Caesars produced for the very first time in this litigation a

11   document it had never before produced to the EEOC – a "Telephone Attendance Log"

12   dated 8/20/2008, which conveniently lists "William Berry" on the very last entry and

13   which claims that on 8/20/08, he was "12 minutes late returning from break."  **Ex. 56** at

14   CB 0025044.   This entry is the only one on the entire document where the "Time Due to

15   Work" is not indicated, and as such there is no documentation giving the specifics as to

16   this alleged infraction.  *Id.* This entry is also the only one on the entire document where a

17   "late returning from break" is being documented on this specific log, as all of the other

18   entries deal with "PTO" "sick pay" or "FMLA."  *Id.*  Late in the litigation, Caesars also

19   produced for the first time an Excel spreadsheet showing that Mr. Berry allegedly

20   accumulated 0.5 points on 10/20 for being late from his break.  Ex. 56 at CB 00250351.

21   But it is undisputed that Mr. Berry never received any kind of documentation of any kind

22   putting him on notice of this alleged half-point attendance violation, and in fact when Mr.

23   Berry signed off on the "documented coaching" document on 8/20/18, the alleged 8/20/18

24   violation is nowhere to be found. It also makes no sense that Caesars would produce a

25   Discipline History Fact Sheet document in 2009 to the EEOC indicating that as of 8/20/18,

26   Mr. Berry had only accumulated 5.5 total attendance points.  It begs the question: when

27   exactly was the alleged half-point violation for 8/20/08 entered by Caesars?

28          Further, it was beyond unusual for Mr. Berry to even be accumulating any points

16

for being merely 12 minutes late from a break – even if that were the case.  Ex. 48 at ¶ 23; Ex. 52 at ¶ 16.  With Caesars producing a documents late in this litigation that contradict a document it provided to the EEOC in 2009, there is simply too much of an issue of fact as to whether Mr. Berry had accumulated 12 attendance points by the time he was terminated on September 16, 2008.

Whether a dealer who is given documented coaching/ written warning experiences no loss of pay or other harm to their employment is an issue of fact. Ex. 45 at ¶ 9.

Whether Caesars "accommodates requests based on language ability" is an issue of fact with respect to the vast majority of requests that Caesars accommodates. *See* Exs. 45-50. If language is such a prevalent issue as Caesars contends, then why does Caesars take the time in some very few instances to actually write down the language the customer wants, but in all of the other instances fails to do so?  Ex. 43. It is even possible that this "language" excuse contradicts a current policy Caesars has of forcing its employees to always speak English to the patrons and other employees in the area.  Ex.45 at ¶ 19. Even if no English-only policies are being broken, it is still a question of fact as to whether customers even need their dealers to speak their language, as there are hosts on-hand in the room to accommodate any language issues.  Ex. 45-50.

Whether Caesars has an unwritten policy of interpreting the term "Asian dealers" to mean dealers who speak Chinese (which is not the only "Asian" language), and whether it is generally understood in the high-limit gambling world that "Caucasian" means unable to speak Chinese (which would mean an African American dealer who does not speak Chinese would be considered "Caucasian") is at best an issue of fact, and in reality is complete nonsense that was fabricated during Ms. Gong's deposition and repeated by Mr. Burdalski in his deposition and in his declaration in support of Caesars' motion.  Ex. 45 at ¶ 8; Ex. 48 at ¶ 20; Ex. 49 at ¶ 16; Ex. 46 at ¶ 7.

## IV.    INADMISSIBLE EVIDENCE IN THE MOTION SHOULD BE STRICKEN

Caesars motion includes exhibits which are not admissible and therefore should not be considered by this Court when determining the merits of the motion.  Specifically,

Caesars includes declarations from certain compliance employees who make statements as to the average number of private salons that are staffed per year. ECF No. 99 at pp. 12-13 (citing to Exs. 22-25 of the Motion). These declarations are inadmissible because the data supporting the claims in these declarations has not been disclosed to Plaintiffs, and it is not even clear that these individuals providing the declarations have been properly disclosed by Caesars in either initial or supplemental disclosures or in responses to written discovery. As such, Plaintiffs have not had the opportunity to depose these witnesses and question them on how they arrived at their figures. The Court should therefore deem such evidence and arguments inadmissible when analyzing the motion.

## V.    LEGAL ARGUMENT

### A.  LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper if the evidence shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir. 1995). As summary judgment allows a court to dispose of factually unsupported claims, the court construes the evidence in the light most favorable to the nonmoving party. *Bagdadi v. Nazari,* 84 F.3d 1194, 1197 (9th Cir. 1996). The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex,* 477 U.S. at 323. If the moving party meets its burden, the party opposing the motion may not rest on the mere allegations or denials of its pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

### B.  SUMMARY JUDGMENT SHOULD NOT BE GRANTED AS TO WILLIAM BERRY

#### 1.  Discrimination Claim

Title VII of the *1964 Civil Rights Act* prohibits discrimination based on an individual's race, color, religion, sex, or national origin. 42 U.S.C. §2000e-2(a).

1     Employers are forbidden from discriminating against employees with respect to

2     compensation, terms, conditions, or privileges of employment. 42 U.S.C. §2000e-2(a)(1);

3     *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 63 (1986).  A Title VII plaintiff carries

4     the initial burden of establishing a *prima facie* case.  *McDonnell Douglas Corp. v. Green*,

5     411 U.S. 792, 802 (1973), *holding modified by Hazen Paper Co. v. Biggins*, 507 U.S. 604

6     (1993).  Specifically, the plaintiff must show that "(1) she belongs to a protected class; (2)

7     she was qualified for the position; (3) she was subject to an adverse employment action;

8     and (4) similarly situated individuals outside her protected class were treated more

9     favorably."  *Nicholson v. Hyannis Air Serv., Inc.*, 580 F.3d 1116, 1123 (9th Cir. 2009).

10     Alternatively, the plaintiff can offer evidence that give rise to an inference unlawful

11     discrimination through direct or circumstantial evidence of discriminatory intent.  *See*

12     *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003), *as amended* (Jan. 2,

13     2004).  *See also Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 889 (9th Cir.1994) (holding that

14     the amount of proof needed to establish a *prima facie* case on summary judgment "is

15     minimal and does not even need to rise to the level of preponderance of the evidence").

16     *See also*, *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 370 (2013) ("to be

17     actionable under Title VII, discrimination must be a motivating factor in, but need not be

18     the but-for cause of, an adverse employment action.").  Additionally, "[a]n adverse

19     employment action is one that causes a material employment disadvantage, such as a

20     tangible change in duties, working conditions or pay." *Thomas v. Spencer*, 294 F. Supp.

21     3d 990, 999 (D. Haw. 2018).  Adverse employment actions take many forms.  *Dahlia v.*

22     *Rodriquez*, 2013 WL 4437594 (9th Cir. Aug. 21, 2013) (placement on administrative

23     leave, deprivation of ability to take promotional exam, and loss of pay are examples).

24        The burden then shifts to the employer to articulate some "legitimate,

25     nondiscriminatory reason" for the employment barrier.  *McDonnell Douglas Corp.* at 802

26     (1973).  The employee then is afforded the opportunity to prove the employer's claimed

27     reason is merely pretext for discrimination.  *Id.* at 804.

28

1    Title VII's discrimination prohibition also encompasses harassment in the form of

2    a hostile work environment.  To establish a "hostile work environment," the plaintiff must

3    prove "a workplace atmosphere so discriminatory and abusive that it unreasonably

4    interferes with the job performance of those harassed." *Brooks v. City of San Mateo*, 229

5    F.3d 917, 923 (9th Cir. 2000).

6    Notably, the Ninth Circuit has repeatedly cautioned that "it should not take much

7    for [a] plaintiff in a discrimination case to overcome a summary judgment motion." *Nigro*

8    *v. Sears, Roebuck & Co.*, 784 F.3d 495, 499 (9th Cir. 2015) (collecting cases); *see*

9    *also Wright v. United Parcel Serv., Inc.*, 609 Fed.Appx. 918, 922 (9th Cir. 2015)

10   (reversing district court's grant of summary judgment on plaintiff's claims for disability

11   discrimination, failure to accommodate, and failure to engage in the interactive process in

12   good faith). *Horn v. Coldwater Creek US Inc*, No. 213CV00413CASEX, 2016 WL

13   3921130, at *9 (C.D. Cal. July 18, 2016).

14   Here, there is no disputing that in 2006, Mr. Berry, was a black, African-American

15   male, belonged to a protected class and was qualified for his position of floor supervisor

16   (which he had been promoted to back in 1995).  Caesars contends that its action of having

17   Mr. Berry publicly removed from a private PC room because a group of customers had

18   determined he was not the correct race was actually *not* discriminatory because Mr. Berry

19   was simply reassigned to a different area of the PC, thus it was merely a "lateral

20   assignment."  ECF No. 99 at p. 19.  In support of this argument, Caesars cites various

21   inapplicable and non-binding decisions from other circuits.   For example, Caesars cites

22   to *O'Neal v. City of Chicago*, 392 F.3d 909, 913 (7th Cir. 2004) in which the Seventh

23   Circuit held that an African-American female sergeant who was transferred from the

24   narcotics unit to the position of beat sergeant did not suffer an adverse employment action

25   required to make a prima facie case of discrimination, as those two positions held the same

26   rank within the police department and received the same pay and benefits.

27   The problem with those cases is this is not a "lateral transfer" matter.  Mr. Berry

28   never transferred job positions, he maintained his position as floor supervisor until he was

terminated.  Instead, Mr. Berry was ruthlessly and humiliatingly *excluded* from a PC private salon room that other similarly-situated non-African American floor supervisors were permitted to work in – based on the color of his skin.

Thus, this is a matter of Caesars abiding by its customer's illegal discriminatory preferences, resulting in certain employees being completely excluded from areas they would otherwise be entitled to work at and prevented from performing their normal job duties.  In the context of Title VII actions, the Ninth Circuit has long held that a customer's discriminatory preference does not justify an employer's discriminatory practice unless— for those protected categories for which the defense is available under Title VII—the discriminatory requirement amounts to a bona fide occupational qualification. *See Tamosaitis v. URS Inc.*, 781 F.3d 468, 482–83 (9th Cir. 2015); *Gerdom v. Cont'l Airlines, Inc.*, 692 F.2d 602, 609 (9th Cir. 1982); 42 U.S.C. § 2000e–2(e).  *See also*, *Olsen v. Marriott Int'l, Inc.*, 75 F. Supp. 2d 1052, 1067 (D. Ariz. 1999) (Holding that the "Marriott utilizes customer preference as a proxy for privacy concerns on the assumption that privacy concerns are the basis for its customers' preferences, but it offers little reliable evidence in support of this assumption.").  Similarly, in its motion, Caesars uses customer preference as a proxy for alleged language barrier concerns on the assumption that language barrier concerns are the basis for its customers' preferences, but the documents in the record provide no evidence to substantiate this claim. *See also*, C. Sunstein, *Three Civil Rights Fallacies,* 79 Cal.L.Rev. 751, 760–61 (1991) (economically "rational" discrimination has powerful reinforcing effect on ordinary prejudice).

Caesars' attempt to compartmentalize this case into a "lateral assignment" or "reassignment to a different position without any reduction in benefits" issue is misguided and inappropriate, as this case is more like *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908 (7th Cir. 2010), in which a nursing home was found liable for Title VII discrimination based on a policy of not allowing a black nursing student to provide care for residents who did not want care from black assistants.  Like Berry, the plaintiff in *Chaney* was told that certain residents were "off limits because she was black," which turned the workplace into

1   a hostile minefield and forced the plaintiff to avoid certain areas of her own workplace, as

2   she was "banned" from certain places. *Id.* at 911. The *Chaney* Court held that a

3   "company's desire to cater to the perceived racial preferences of its customers is not a

4   defense under Title VII for treating employees differently based on race." *Id.* at 913.

5         It is also inaccurate to claim that Mr. Berry suffered no adverse treatment simply

6   because he received no reduction in pay or benefits.  To the contrary, Mr. Berry was made

7   to feel like he was not good enough to be in a certain area of the workplace, because he

8   was black, which humiliated him and made him feel like a "second-class citizen" who was

9   judged on his color instead of his ability.  Ex. 1 at 156:4-18; Ex. 48 at ¶ 9.

10         Finally, it is disingenuous for Caesars to assert that Mr. Berry is automatically

11   disqualified from asserting any hostile work environment claim simply because he is only

12   complaining about one main offensive incident.  ECF No. 99 at p. 22.  The frequency of

13   the conduct is only one factor of many in the hostile work environment analysis.  *See*

14   *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1113 (9th Cir. 2004) ("In evaluating the

15   objective hostility of a work environment, the factors to be considered include the

16   "frequency of discriminatory conduct; its severity; whether it is physically threatening or

17   humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

18   employee's work performance.").

19         While the Ninth Circuit has recognized in certain cases that a single instance, such

20   as a single racially offensive drawing, "is not sufficient to raise a jury question," (*See*

21   *Gregory v. Widnall*, 153 F.3d 1071, 1075 (9th Cir. 1998)) there is no hard and fast rule on

22   this issue.  *See also*, *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1096 (9th Cir. 2008)

23   (reversing award of summary judgment in favor of defendant-employer when plaintiff had

24   raised genuine issues of material fact on her disparate treatment, retaliation, and hostile

25   work environment claims).  In *Horn v. Coldwater Creek US Inc*, No.

26   213CV00413CASEX, 2016 WL 3921130, at *9 (C.D. Cal. July 18, 2016), the defendant

27   company also complained that the plaintiff was describing "what amounts to a single,

28   isolated incident," yet the Ninth Circuit held that the where the severity of the alleged

abuse "is questionable, it is more appropriate to leave the assessment to the fact-finder than for the court to decide the case on summary judgment." It is frankly premature to speculate as to how a fact-finder will judge the severity of the humiliation and degradation that comes with being exiled from a portion of the workplace based on a protected status, and therefore this issue should not be settled on summary judgment.

## 2. Retaliation Claim

To make out a prima facie case of retaliation, an employee must show that (1) he engaged in a protected activity; (2) his employer subjected him to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action. *See Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1464 (9th Cir.1994). If a plaintiff has asserted a prima facie retaliation claim, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its decision. *Id.* at 1464–1465. If the defendant articulates such a reason, the plaintiff bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive. *Id. See also, Univ. of Texas Sw. Med. Ctr. v. Nassar,* 570 U.S. 338, 352, (2013) ("Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action.").

Caesars does not dispute that termination constitutes an adverse employment action. Instead, Caesars contends that Berry was not terminated for engaging in protected activity, but because Mr. Berry was terminated for violating the attendance policy (which is an issue of fact, as stated above). Caesars also insists that Mr. Berry's retaliation claim automatically fails because of the "23-month delay between Berry's protected activities and his termination." ECF No. 25. In reality, the termination occurred a mere five months after NERC issued its Determination of Discrimination, which brought Mr. Berry's protected activities to the forefront. Exs. 10-11. *See, Miller v. Fairchild Indus.,* 885 F.2d 498, 505 (9th Cir.1989) (stating that a prima facie case of causation was established when discharges occurred forty-two and fifty-nine days after an EEOC fact-finding conference – not an EEOC complaint; similarly, Mr. Berry's involvement and participation in the

23

EEOC's investigation constitutes further protected action that alters Caesars' arbitrary timeline of the "delay" prior to the termination).

Additionally, Caesars' reliance on *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) is misplaced, as that case involved a plaintiff relying upon an inference of timing alone in an effort to create causation, and the Ninth Circuit held that the 18-month lapse between the protected activity and the adverse action was simply too long, by itself, to give rise to an inference of causation.  A prima facie case of retaliation may be based on direct or circumstantial evidence, and close timing between the protected action and the adverse employment action is just one example of circumstantial evidence that can be sufficient to create a prima facie case, but it is by no means necessary. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 969 (9th Cir. 2002).   The protection afforded under the anti-retaliation law is much broader than Caesars concedes. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67, 126 S. Ct. 2405, 2414, 165 L. Ed. 2d 345 (2006). ("Interpreting the antiretaliation provision to provide broad protection from retaliation helps ensure the cooperation upon which accomplishment of the Act's primary objective depends. . . . [A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'").

Here, Caesars insists that HR rep Aisha Collins "made the decision to terminate Berry when meeting with him to determine whether he had a valid excuse for his no-call-no-show, but this is a disputed issue of fact, as the decision was obviously already made by that point.  Mr. Berry was handed prepared termination paperwork without being given a prior due process meeting to challenge the secret August 20, 2008 infraction, nor to provide his reasons for the no-call-no-show on Saturday, September 13, 2008.

Further, just because Caesars' decision to terminate other employees for excessive absence does not preclude Mr. Berry from stating a prima facie case of retaliation.  As set forth in Mr. Berry's affidavit, he was taking a lot of FMLA-protected leave, for which he

1  was initially disciplined, and which then had to be reversed.  Further, it was highly unusual

2  for Mr. Berry to even to be docked a half a point for being 12 minutes late from a break,

3  and it is unclear how many of the "106 other Caesars employees" who were terminated

4  went through the same process of a mysterious half-point deficiency that was not included

5  on any lists of violations.  Ex. 48 at ¶ 23; Ex. 52 at ¶ 16.  Accordingly, material issues of

6  fact exist regarding Mr. Berry's retaliation claim.

7        **C.  SUMMARY JUDGMENT SHOULD NOT BE GRANTED TO CAESARS AS TO**

8              **CYNTHIA FALLS OR SHANE KAUFMANN**

9              1.  Discrimination Claims

10       The evidence indicates (and the EEOC agrees) that Plaintiffs Falls and Kaufmann

11 were subjected to discriminatory treatment at Caesars, and were treated differently on

12 numerous occasions because they are not Asian.  Plaintiffs Kaufmann and Falls kept

13 detailed notes over the years of numerous, severe and pervasive instances wherein they

14 were excluded from certain areas based on their national origin, sex, race, or age.  *See*

15 Exs. 22, 23, 24, 30, 34.  They also testified to their own memory of discriminatory

16 conduct.  This ongoing discrimination is the definition of a hostile work environment, and

17 Caesars' attempt to frame this as merely being assigned from one location in the casino to

18 another is indicative of its cavalier attitude toward civil rights law.  There is no case law

19 which states that hostile work environments only exist where there are "physical threats

20 or intimidation."  In this context, being excluded from certain areas in PC is degrading

21 and embarrassing, as numerous witnesses have testified.  Exs. 45-50.

22              2.  Retaliation Claims

23       Caesars incorrectly states that "lateral transfers" and re-assignments are not

24 adverse actions.  The Ninth Circuit has held otherwise.  *See Ray v. Henderson*, 217 F.3d

25 1234, 1243 (9th Cir. 2000) (Adopting the EEOC test for retaliation, which covers

26 "lateral transfers, unfavorable job references, and changes in work schedules. These

27 actions are all reasonably likely to deter employees from engaging in protected activity.").

28 Further, the Plaintiffs have provided testimony explaining why assigning them outside of

Palace Court (while they are in their tuxedos) and making them work the main casino is humiliating.  *See, e.g.* Ex. 35 EEOC K 253-255 ; Ex. 30 at 152:17-153:11; Exs. 45-50.

Additionally, Caesars insists that "documented coaching" and other write-ups and written warnings cannot be considered adverse actions because they have no effect on "pay, benefits, or ther terms and conditions of employment."  ECF No. 99 at p. 29.  To the contrary, courts have found that write-ups and reprimands may in fact be adverse actions.

> In its reply, defendant contends that, as a matter of law, Johnson's write-ups and reprimands were not "adverse employment actions." Ultimately, however, the Court cannot make any such conclusion as a matter of law. "[N]umerous cases recognize that adverse employment action includes treatment similar to that here at issue." *Yanowitz*, 36 Cal. 4th at 1060 (citing *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998) (finding that *written reprimands*, an employer's solicitation of negative comments by coworkers, and a one-day suspension constituted adverse employment actions); *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1264 (10th Cir. 1998) (holding that coworker hostility or retaliatory harassment, if sufficiently severe, can constitute adverse employment action for purposes of a title VII retaliation claim)).

*Horn v. Coldwater Creek US Inc*, No. 213CV00413CASEX, 2016 WL 3921130, at *11 (C.D. Cal. July 18, 2016).

Additionally, Kaufmann and Falls were heavily involved in the EEOC's investigative process, which places Caesars' self-serving calculations of the dates between protected activity and retaliatory conduct at issue.

## VI.    CONCLUSION

For the reasons stated herein, Defendant Caesars Palace's motion for summary judgment should be denied in its entirety.

Respectfully submitted this 14th day of February, 2019,

<table>
<tr>
<td>

JASON R. MAIER, NV Bar No. 8557
DANIELLE J. BARRAZA, NV Bar No. 13822
**MAIER GUTIERREZ & ASSOCIATES**
8816 Spanish Ridge Avenue
Las Vegas, NV 89148

</td>
<td>

/s/ Kathleen J. England
Kathleen J. England, NV Bar No. 206
**GILBERT & ENGLAND LAW FIRM**
610 South Ninth Street
Las Vegas, NV 89101
*Attorneys for Plaintiffs William J. Berry, Jr.,
Cynthia Falls, and Shane Kaufmann*

</td>
</tr>
</table>

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that on the 14th day of February, 2019, "**PLAINTIFFS'**

3  **OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**" will

4  be made through the CM/ECF electronic filing and service system, to all on the service

5  list, including:

6
Esther G. Lander
William J. Edelman
7  AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Ave. NW
8  Washington, DC 20036-1564

9
Patrick H. Hicks
10  LITTLER MENDELSON P.C.
3960 Howard Hughes Pkwy, Ste. 300
11  Las Vegas, NV 89169

12

13

14                        By:  __/s/ Danielle Barraza_____

15                        An Employee of MAIER GUTIERREZ & ASSOCIATES

16

17

18

19

20

21

22

23

24

25

26

27

28